1   GERALD S. OHN (SBN 217382)
    gerald@ohnlaw.com
2   **LAW OFFICES OF GERALD S. OHN, APC**
    1875 Century Park East, Suite 700
3   Los Angeles, CA 90067
    Telephone: 310-407-8655
4   Facsimile: 310-694-3049

5   Young W. Ryu (SBN 266372)
    young.ryu@youngryulaw.com
6   **LAW OFFICE OF YOUNG W. RYU**
    9595 Wilshire Blvd, Suite 900
7   Beverly Hills, CA 90212
    Telephone: (888) 365 – 8686
8   Facsimile: (800) 576 – 1170

9   Attorneys for Plaintiffs

FILED
CLERK, U.S. DISTRICT COURT

AUG 1 4 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

COPY

10            UNITED STATES DISTRICT COURT

11           CENTRAL DISTRICT OF CALIFORNIA

12                 WESTERN DIVISION

13

14   ANTHONY AN and KENNY KANG,          Case No.  CV13-05962-CAS (PJWx)
     on behalf of themselves and a Class of
15   all others similarly situated,       **CLASS ACTION COMPLAINT**

16                           Plaintiffs,

17        v.                              **DEMAND FOR JURY TRIAL**

18

19   NONGSHIM COMPANY, LTD.;
     NONGSHIM AMERICA, INC.;
20   OTTOGI COMPANY, LTD.; OTTOGI
     AMERICA, INC.; SAMYANG
21   FOODS COMPANY, LTD.; SAM
     YANG (U.S.A.), INC.; KOREA
22   YAKULT CO., LTD; PALDO CO.,
     LTD.; and DOES 1-10,
23
                             Defendants.
24

25

26

27

28

                              1

All allegations in this Class Action Complaint ("Complaint") against defendants NONGSHIM COMPANY, LTD.; NONGSHIM AMERICA, INC.; OTTOGI COMPANY, LTD.; OTTOGI AMERICA, INC.; SAMYANG FOODS COMPANY, LTD.; SAM YANG (U.S.A.), INC.; KOREA YAKULT CO., LTD; PALDO CO., LTD.; and DOES 1-10 (collectively, "Defendants") are based upon information and belief, except those allegations that pertain to plaintiffs Anthony An and Kenny Kang and (collectively, "Plaintiffs"), which are based on personal knowledge.  Plaintiffs' information and belief are based upon, *inter alia*, Plaintiffs' own investigation and the investigation conducted by Plaintiffs' attorneys.   Each allegation in this Complaint either has evidentiary support or, alternatively, is likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.  Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.      This action is brought under Section 16 of the Clayton Act to secure equitable relief against the Defendants due to their violations of Sections 1 and 3 of the Sherman Act, as well as under the antitrust and other laws of the State of California and other States listed herein, to obtain restitution, recover damages, and to secure other relief against the Defendants for violations of those state laws.  The Court has subject matter jurisdiction over the federal antitrust claims asserted in this action pursuant to 15 U.S.C. § 26; 15 U.S.C. § 1; 15 U.S.C. § 3; 28 U.S.C. § 1331; and 28 U.S.C. § 1337.  The Court has jurisdiction over the state law claims asserted in this action under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

2.      Venue is proper in this judicial district pursuant to 15 U.S. C. § 22 and 28 U.S.C. § 1391 (b), (c) and (d), because a substantial part of the events giving rise to the claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants has an agent, maintains an office or does business in this District.

2

3.      This Court has personal jurisdiction over each of the Defendants because they, directly and/or through affiliates:  (a) have headquarters in this District, (b) transacted business throughout the United States, including in this District, (c) have had substantial contacts with the United States, including in this District; and/or (d) were engaged in illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

4.      Defendants' conduct alleged in this complaint involves import trade and import commerce with the Republic of Korea ("Korea" or "South Korea"). The conduct also has a direct, substantial, and reasonably foreseeable effect on U.S. trade or commerce.

## INTRODUCTION

5.      Plaintiffs bring this action individually and on behalf of a class consisting of all persons and entities who indirectly purchased Korean Noodles from Defendants in the United States from May 2001 to the present.

6.      This action arises out of a long-running conspiracy among Defendants and their American subsidiaries to agree, combine and conspire to fix, raise, maintain or stabilize the prices at which Korean Noodles were sold in the U.S.  This conspiracy was concealed from the public until on or about July 12, 2012, when the Korean Fair Trade Commission issued an order and findings (the "Korea Order") revealing that the Defendants had colluded to increase prices and to keep prices inflated.  Moreover, the Korea Order required the Defendants to pay a total of approximately $120 million.

7.      Defendants' price-fixing resulted in increased prices for Korean Noodles sold in the United States and its territories (collectively "United States"). As a result of Defendants' price fixing conspiracy, Plaintiffs and the members of the indirect purchaser class have been injured by paying more for Korean Noodles than they otherwise would have paid in the absence of Defendants' conspiracy.

# THE PARTIES

**Plaintiffs**

8.     Plaintiff Anthony An resides in Los Angeles, California.  Plaintiff Anthony An indirectly purchased Korean Noodles in the United States from one or more of the Defendants during the Class period, for his own use and not for resale, and was injured as a result of Defendants' illegal conduct.

9.     Plaintiff Kenny Kang resides in Los Angeles, California.  Plaintiff Kenny Kang indirectly purchased Korean Noodles in the United States from one or more of the Defendants during the Class period, for his own use and not for resale, and was injured as a result of Defendants' illegal conduct.

**Defendants**

10.     Defendant Nongshim Company, Ltd. is organized and exists under the laws of South Korea with its principal place of business in Dongjak-Gu Seoul, South Korea.  During the class period, Nongshim Company, Ltd. participated in the price-fixing scheme alleged herein.  Defendant Nongshim Company, Ltd. is a leading food company in South Korea.  Nongshim Company, Ltd. has had a high market share in Korea since the 1990s and, since 2010, represents approximately 70% of the Korean Noodles business in Korea.  In the United States during the class period, Nongshim Company, Ltd. also held a dominant share of the market for Korean Noodles.  Nongshim Company, Ltd. established its United States manufacturing facility in Rancho Cucamonga, California in or around June 2005.

11.     Defendant Nongshim America, Inc. is a California corporation with its principal place of business in Rancho Cucamonga, California.  It has other locations in Emeryville California, as well as in Texas, New Jersey, Illinois, Georgia, and Maryland.  Nongshim America, Inc. operates, manages and directs its national sales and business operations from its offices in California.  Defendant Nongshim America, Inc. has major management, manufacturing, storage and distribution

4

1   facilities in California.  Defendant Nongshim America, Inc. is a wholly owned and

2   controlled subsidiary of defendant Nongshim Company, Ltd.

3       12.    Nongshim Company, Ltd. and Nongshim America, Inc. are referred to

4   collectively herein as "Nongshim".

5       13.    United States sales of Nongshim's Korean Noodles accounts for 15%

6   of the company's consolidated sales and 7% of the total operating profit in 2010.

7   As of 2006, United States sales accounted for 34.1% of Nongshim's non-Korean

8   sales.

9       14.    Defendant Ottogi Company, Ltd. is headquartered in Daechi-dong

10   Gangnam-gu, Seoul, Korea.

11       15.    Defendant Ottogi America, Inc. is a California corporation.  Defendant

12   Ottogi America, Inc. is headquartered and has a warehouse in Gardena, California.

13   Defendant Ottogia America, Inc. also has an office in Los Angeles, California.

14   Ottogi America, Inc. is a wholly owned and controlled subsidiary of Ottogi

15   Company, Ltd.  Ottogi America sells and distributes Ottogi's Korean Noodles

16   throughout the United States.  Ottogi's noodle products are all manufactured in

17   Korea.

18       16.    Defendants Ottogi Co Ltd and Ottogi America are referred to

19   collectively at "Ottogi."

20       17.    Defendant Samyang Foods Company, Ltd. is headquartered in

21   Seongbuk-Gu, Seoul, Korea.

22       18.    Defendant Sam Yang (U.S.A.), Inc. is a California corporation with its

23   principal place of business in Santa Fe Springs, California.  Sam Yang (U.S.A.), Inc.

24   is a wholly owned and controlled subsidiary of Samyang Foods Company, Ltd.

25   Sam Yang (U.S.A.), Inc. sells and distributes Samyang's Korean Noodles

26   throughout the United States.  Samyang's noodle products are all manufactured in

27   Korea.

28

19.     Defendants Samyang Foods Company, Ltd. and Sam Yang (U.S.A.), Inc. are referred to collectively as "Samyang."

20.     Defendant Korea Yakult Co., Ltd is a South Korean corporation based in Seochu-gu, Seoul, Korea.  It makes beverages, Korean Noodles, and other dairy products.  Korea Yakult Co., Ltd distributes its products overseas under the name Paldo.

21.     Defendant Paldo Co., Ltd. is a South Korean corporation located in Los Angeles, California.  Paldo Co., Ltd. is a wholly owned and controlled subsidiary of Korea Yakult Co., Ltd.  Paldo Co., Ltd. distributes Korea Yakult's Korean Noodles throughout the United States.  Korea Yakult's noodle products are all manufactured in Korea.

22.     Defendants Korea Yakult Co., Ltd. and Paldo Co., Ltd. are referred to collectively herein at "Yakult."

23.     The true names and/or capacities of defendants sued herein as Does 10 through 10 are unknown to Plaintiffs, which therefore sues these defendants by fictitious names.  Plaintiffs intend to seek to amend the Complaint to state their true names and capacities when ascertained.  In this regard, various entities not named as defendants have participated in the violations alleged herein and have performed action and made statements in furtherance thereof.  Plaintiffs reserve the right to name some or all of these entities at a later date.  The acts alleged herein that were done by each of the co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

### INTERSTATE TRADE AND COMMERCE

24.     The violations of federal antitrust laws alleged herein have impacted substantial amount of interstate trade and commerce.

## CLASS ACTION ALLEGATIONS

25.     Plaintiffs seek certification, under Fed. R. Civ. P. 23 (a) and (b), and bring this action on behalf of themselves and a class (the "Class") consisting of:

> All persons and entities residing in the United States who indirectly purchased Korean Noodles in the United States from Defendants at any time from May 2001 through the present for their own use and not for resale.  The Class excludes the Defendants, co-conspirators, and any of their subsidiaries or affiliates.  The Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

26.     Members of the Class are so numerous that joinder is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members number in at least the thousands and are so geographically diverse that joinder of all Class members is impracticable.

27.     Plaintiffs' claims are typical of the claims of other Class members, as they arise out of the same course of conduct.  Consequently, Plaintiffs interests are aligned with, and not antagonistic to, those of the other members of the Class. Questions of law and fact are common to all members of the Class, and such common issues of law and fact predominate over any questions affecting only individual members of the Class.

28.     The common issues of law and fact include, but are not limited to, the following:

a)     whether Defendants engaged in or entered into a contract, combination or conspiracy among themselves to fix, maintain, raise and/or stabilize the prices of Korean Noodles sold in the United States;

b)     whether Defendants' unlawful conduct has enabled them to increase, raise, maintain or stabilize above competitive levels the prices for Korean Noodles sold in the United States;

1    c)    the duration of the contract, combination, or conspiracy alleged herein;

2    d)    whether Defendants' conduct violates Sections 1and 3of the Sherman

3    Act;

4    e)    whether Defendants' conduct violates Sections 16720 and 17200 of the

5    California Business and Professions Code;

6    f)    whether Defendants' conduct violates the antitrust, consumer

7    protection laws and unfair competition laws of other states;

8    g)    whether the conduct of Defendants caused injury to Plaintiffs and

9    Class members;

10    h)    whether Defendants' conspiracy affected the prices of Korean Noodles

11    sold in the United States;

12    i)    whether class-wide injunctive relief is appropriate; and

13    j)    the appropriate class-wide measure of damages.

14    29.    These and other questions or law or fact which are common to the

15    members of the Class predominate over questions affecting only individual

16    members of the Class.

17    30.    Plaintiffs and their counsel can and will fairly and adequately represent

18    the interests of the Class and have no interests that are adverse to, conflict with, or

19    are antagonistic to the interests of the Class.  Plaintiffs have retained counsel who

20    are experienced in class actions and other complex litigation.

21    31.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2)

22    because Defendants have acted or refused to act on grounds that apply generally to

23    the class, so that final injunctive relief or corresponding declaratory relief is

24    appropriate respecting the Class as a whole.  Moreover, in the absence of a class

25    action, Defendants would be unjustly enriched because they would be able to retain

26    the benefits and fruits of their wrongful conduct.

27    32.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3)

28    because common questions predominate over individual questions and a class

1    action is the superior procedural vehicle for fairly and efficiently adjudicating the

2    claims asserted.

3        33.    The questions of law and fact common to the members of the Class, as

4    identified above, predominate over any questions affecting only individual

5    members, including legal and factual issues relating to the Defendants' liability and

6    damages.  Indeed, Plaintiffs' claims and other Class members' claims arise from the

7    same course of conduct and Plaintiffs and other Class members share the same legal

8    rights.

9        34.    A class action is superior to other available methods for the fair and

10   efficient adjudication of this controversy.  Prosecution as a class action will

11   eliminate the possibility of needlessly repetitive litigation.  Separate actions by

12   individual Class members would also create a risk of inconsistent or varying

13   judgments, which could establish incompatible standards of conduct for the

14   Defendants and substantially impede or impair the ability of Class members to

15   pursue their claims.  As such, the suit is properly maintainable as a class action

16   under Fed. R. Civ. P. 23(b)(1).

17       35.    There would be enormous efficiencies to the Court and the parties in

18   litigating the common issues on a class-wide, instead of a repetitive individual,

19   basis.  Treatment as a class action will permit a large number of similarly situated

20   persons to adjudicate their common claims in a single forum simultaneously,

21   efficiently, and without the duplication of effort and expense that numerous

22   individual actions would engender.  The Class is ascertainable and this action

23   presents no it difficulties in management that would preclude maintenance as a

24   class action.

25       36.    The claims in this action are also properly certifiable under the laws of

26   the State of California, and of the other individual state identified below.

27

28

# FACTUAL ALLEGATIONS

**Korean Noodles**

37.     Korean Noodles subject to the Korea Order included instant Noodles manufactured by the Defendants that are often sold with a seasoning packet or dehydrated vegetables, and are packaged either in a packet or a cup or bowl.  With a packet, the Noodles are cooked in water, and then the seasoning and dehydrated vegetables are added. With a cup or bowl, the seasoning and vegetables are already included in the cup, and hot water is added to the cup.

38.     In addition, Korean Noodles that were the subject to the Korea Order ("Korean Noodles") include, but are not limited to, the following:

- • Kimchi Ramen- ramen Noodles with kimchi added
- • Udon- thick wheat-based noodle
- • Kalgugsu - flat Noodles with seafood
- • Chajang- Noodles with black bean or soy bean paste
- • Champong - spicy seafood noodle soup
- • Bibimmyun- spicy cold Noodles
- • Yukgaejang- spicy soup with beef and scallions
- • Potato Ramen- ramen made with potato starch

39.     Korean Noodles often have a different flavor profile than other types of Noodles sold in the United States, including Japanese ramen.  Korean Noodles have unique spices, which are often hotter than instant Noodles from Japan, China, or elsewhere.  Korean Noodles are marketed in the United States as a premium product compared to other Noodles.  For example, Nongshim's 2003 Factbook[1] stated that:

- • By targeting Korean Americans and locals, exports to the United States increased by 14.2% over the previous year.

_____

[1] Previously available at www.nongshim.com

10

• Three Japanese firms, Maruchan, Nissin, and Sanyo, are competing on low-priced products, whereas Nongshim is focused on differentiating itself through high-end products.

• Nongshim's marketing strategy is focused on enhancing its brand image through strengthening its marketing emphasis on "Korean Taste."

40.     Similarly, Nongshim's 2006 annual report stated that:

• Nongshim is continuously spreading its unique taste, the representative taste of Korea, to every corner of the world.

• Nongshim continues to create unique tastes that appeal to Koreans through constant research and development efforts, which has allowed us to keep our top position in the domestic Ramen market for the past 20 years.

• Nongshim's hot taste came up with explosive demands from the markets of Korean Americans and Asian Americans, dramatically increasing our export quantities and motivating us to set up a local factory in LA where we saw the biggest potential and geographical advantage in 2005 for the new momentum of our Globalization strategy.

• This success was because Nongshim's main product, Shin Ramyun, was created with a unique taste to fulfill its consumers' needs through well balancing the taste of red chili and beef in the hot soup and supplementary soup ingredients such as dried green onion and mushroom with chewy Noodles of high quality flour.

41.     Similarly, Nongshim's 2008 annual report stated that:

• Targeting over 1.4 million ethnic Koreans living in the US, we have exported instant Noodles to Los Angeles since 1971.

• The North American  market, which ranks fourth in instant noodle consumption, is in its early stages of maturity.  However, the high-end product market is still emerging.  Through market segmentation

strategies, Nongshim is reducing its dependence on ethnic Koreans in the US and moving toward the Hispanic market, which has a high growth potential, as well as toward the mainstream market in the East.

42.     Similarly, Nongshim's 2009 annual report stated that:

Nongshim has successfully tapped in into the US market by putting emphasis on down-to-earth marketing and merchandising.  Nong Shim has made stable growth in the US consumer markets as well as Korean American and Chinese American consumer markets. Sales of 'SHIN' brand recorded US $32 million in the same period, which indicate an accelerated globalization of the brand.

43.     Yakult's Hwa Ramen has a similar flavor profile to Nongshim's Shin Ramyun, and rivals the bestselling Shin ramyun from Nongshim in its spiciness and savory broth.

44.     Paldo's ramen products, like Nongshim's, are premium quality and offers variety of different styles.

45.     Ottogi's Jin Ramen is similar to Yakult's and Nongshim's Korean Noodles. According to orderramen.com, Jin Ramen is a premium brand from Korea. Ottogi has been making gourmet style ramen for quite some time now.  This one is rivaled in its spiciness to Nongshim's Shin ramyun or Paldo's Hwa ramen.

46.     Orderamen.com states that Samyang's KalGugSu is "a traditional Korean handmade style noodle in clam broth . . . [that] is thicker and creamier compared to other ramen" and lists related products as Ottogi's Jin Ramen and Nongshim's Shin ramyun.

47.     During the relevant time period, the Defendants sold hundreds of millions worth of Korean Noodles in the United States.

48.     There are high barriers to the entry of the Korean Noodles market. The manufacture and sale of Korean Noodles is capital-intensive.  A company seeking to

enter the Korean Noodles business must make a large scale investment in a manufacturing plant and various automated processes.  These challenges to market entry result in limited competition.

**The Price-Fixing Conspiracy**

49.     Starting in or around late 2000 or early 2001, Defendants each agreed to a specific protocol that would be followed in factory-level price increases. Nongshim, as the market leader, would generally increase prices first, and the other Defendants would raise the prices shortly thereafter.  The Defendants would provide each other non-public pricing information, often through each, company's market research teams, to promote this collusion.

50.     Once a Defendant made an internal decision to increase factory prices, it would then communicate the price increases to various stores.  With the exception of Nongshim in May 2001, as is discussed below, other than through communications to stores, information about such price increases was not made publicly available.

51.     However, in furtherance of the conspiracy, Defendants would often communicate non-public details of price increases to each other at the same time, if not before, stores received such information.

52.     Defendants would also use the method of old price support to enforce compliance with price increases.  Under this method, a price increase would be decided days or weeks in advance of the increase taking effect.  However, if one Defendant were to announce price increases, and other Defendants failed to do the same, the first Defendant could just delay the price increase until the other Defendants relented and announced their own price increases.  Old price support would prevent any Defendant from gaining a sales advantage from another Defendant's price increase.  In fact, according to a Yakult report, entitled The Analysis of Effect of Price Increase, Nongshim once delayed old price support for 82 days because Samyang and Ottogi delayed their own price increases.

53.     Defendants' collusion on prices for Korean Noodles happened repeatedly between 2001 and 2008 and, on information and belief, thereafter. Samyang's President, 00 Kim[2] affirmed to the Korean Fair Trade Commission that:

> From price increase in 2001, when I [led] the price increase of [Samyang] for the first time, to the price increase in 2008, [the] ramen market exercised price information exchange, real price increase work, etc. . . . systematically and repeatedly.

54.     00 Kim also stated that the process would work as follows:  before the price increase, employees from each company in charge of market research/external business exchanged information; after the price increase; sales team of each company checked on price situation at distribution channels including chain stores. In addition, for the great matters which might jeopardize price system of the business, such as price dumping, the companies maneuvered through the Ramen Conference, discussed below.

55.     Similarly, 00 Yui, a member of Samyang's Marketing Team, stated to the Korean Fair Trade Commission that in order not to break the bond of sympathy, which is about exchanging information before announcement of price increase, among ramen companies' employees in charge of market research/external business, he informed the competitors with the information when the proposal was completed or approved, even if not completed, if possible.

56.     According to the Korea Order; 00 Yui further stated that pricing information was often provided to other Defendants even before it was provided to distribution channels as it was a rule that employees in charge of external business shared confirmed proposal of price increase before information about price was provided to distribution channels.  That is, there was a tacit agreement among employees in charge of market research of external business to share information

---

[2] The Korea Order identified witnesses by their last name only, and included the designation of "OO".

1   about price increase before ramen manufacturing company provides the proposal of

2   price increase to each distribution channel.  Therefore, when it was revealed that

3   one provided a price increase proposal to distribution channels first by breaking the

4   agreement, others complained to the employees in charge of the company that

5   violated the agreement.

6   **The First Price Increase**

7        57.     In late December of 2000 or early January of 2001, representatives of

8   each Defendant met in the Renaissance Seoul Hotel.  At this meeting, the

9   Defendants agreed to collectively raise the prices of Korean Noodles.

10        58.     00 Choi, the Chairman of Samyang' s Office of Business, reported to

11   00 Chon, Samyang's CEO, about the discussions at this meeting.  00 Choi told 00

12   Chon that someone brought up the topic of whether ramen prices should be

13   increased and it seemed that everyone agreed that once Nongshim increased the

14   price, everyone would increase the price as well.  00 Choi estimated that the price

15   increases would provide Samyang with 200-300 million Korean won monthly.

16        59.     00 Choi also discussed the meeting with 00 Kim, a consultant at

17   Samyang's head business office.  00 Choi told 00 Kim that we discussed that it had

18   been 2-3 years since ramen price was increased.   If Nongshim increased first,

19   others will follow and raise it.

20        60.     On March 28, 2001, representatives from Nongshim, Samyang, Yakult,

21   and Ottogi attended the Regular General Assembly of Ramen Conference, held at

22   the Capital Hotel in Seoul.  At this conference, Defendants met and confirmed their

23   agreement to cooperate concerning price increases.  According to 00 Ahn, Vice

24   Chair of Samyang's head business office, one of the board members of either Ottogi

25   or Paldo asked director Yoon of Nongshim if they could increase the price in

26   consecutive order after Nongshim increases it and how the price increase project of

27   your company has proceeded thus far.

28

61.     Ottogi and Yakult representatives responded:  Yes. We wouldn't be released from the pressure of production cost, unless there is a two-digit increase.

62.     00 Yoon replied "[w]ouldn't it be difficult to have a two digit increase? I remember that there had not been any two-digit increase in the past . . . , anyway, the price increase will be implemented soon."

63.     Thus, at the March 28, 2001 Ramen Conference meeting, Defendants colluded on the subsequent collective price increase.

64.     On May 10, 2001, Nongshim announced to the media that it was increasing the price of its Korean Noodles.  Nongshim provided few details about the price increase, and stated that the amount and timing of the price increase would be determined the following week.

65.     That same day, the other Defendants also announced that they were contemplating price increases as well.

66.     The announcements of the price increase were unusual in that usually price increases were not reported to the media ahead of time.

67.     On May 14, 2001, Nongshim decided to increase factory prices effective May 21, 2001. The factory price increase averaged 9.9% for 34 products.

68.     That same day, Nongshim provided Samyang with specific details about Nongshim's price increase.

69.     An Ottogi internal memorandum, dated May 14, 2001, notes that the price of Jin Ramen would be increased, which was identical to Nongshim's price increase for Shin Ramyun.  On May 17, 2001, Samyang decided to increase factory prices by June 1, 2001. The factory price increase averaged 12% for 17 products. Samyang also decided to increase the price of its Ramen the same amount as Nongshim's Shin Ramyun.

70.     Later, Samyang provided additional non-public details of its price increase to the other Defendants. For example, an internal memorandum from Ottogi, dated May 22, 2001, reveals non-public details about Samyang's price

increase, demonstrating that Ottogi presumably obtained such information from Samyang as well.

71.    Similarly, The Report of Examination of Ramen Price Increase Application Period written by Ottogi's Marketing Team on May 24, 2001, provided significant information concerning the other Defendants' price increases:

• From June 1st, Nongshim expects to apply increased price, provided, Nong Shim is looking for an additional support strategy because it worries the decrease of sales due to the competitors' pushing previous price after normal price increase in June.

• Samyang decided increased price per item, but increase details and application date on an official document have not been confirmed yet.  The expected date of increased price application is early June, and the expected date of previous price application is expected to be until June 15.

72.    Yakult decided increase price per item, but increase details and application date on an official document have not been confirmed yet. The expected date of increase price application is early June, and the expected date of previous price application is expected to be until June 15.  On May 24, 2001, Samyang provided pricing details, by fax, to Yakult.

73.    On May 30, 2001, Yakult decided to increase factory prices effective June 1, 2001.  The factory price increase averaged 9.7% for 18 products.  Yakult also decided to increase the price of its King Ramen the same amount as Nongshim's Shin Ramen.

74.    According to notes created by 00 Choi, a member of Yakult's legal team:  during the price increase in 2001, 00 Kang working for Yakult Marketing team shared advance information with 00 Lee from Nongshim, 00 Kim from Samyang, and 00 Hong from Ottogi.  His notes also stated that before Yakult's price increase, Nongshim confirmed in advance (via email) it is assumed that these data were shared with Ottogi and Samyang.

75.     On May 22, 2001, Ottogi decided to increase factory prices effective June 15, 2001. The factory price increase averaged 10.5% for 52 products. Ottogi later pushed the effective date to July 1, 2001, after determining the other Defendants' price support periods. Ottogi also decided to increase the price of its Ramen to the same price as Nongshim's Shin Ramyun.

76.     Furthermore Ottogi prepared a report titled "Our Company's Ramen Item Price Adjustment Proposal (Final)" on May 28, 2001. It sent this report to Yakult soon after it was created.

**The Second Price Increase**

77.     On October 21, 2002, Nongshim decided to increase factory prices effective October 25, 2002. The factory price increase averaged 8.5% for 39 products. That same day, it provides details and dates concerning this price increase to Samyang.

78.     On October 25, 2002, Samyang decided to increase factory prices effective November 1, 2002. The factory price increase averaged 9.5% for 28 products. Samyang also decided to increase the price of its Ramen to the same amount as Nongshim's Shin Ramyun.

79.     Samyang, through employees on its Market Research team, provides the details of these price increases to the other Defendants.

80.     On November 1, 2002, Yakult decided to increase factory prices effective December 1, 2002. The factory price increase averaged 8.6% for 25 products. Yakult also decided to increase the price of King Ramen to the same amount as Nongshim's Shin Ramyun.

**The Third Price Increase**

81.     On or around December 15, 2003, Nongshim decided to increase prices effective December 22, 2003. The price increase averaged 7.7% for 24 products.

82.     On December 18, 2003, Nongshim emailed Samyang details of the price increase for each item.

83.     Samyang then provided the details of the price increase to other Defendants, including Nongshim.

84.     Sometime before February 21, 2004, the Nongshim Distribution Research Team prepared a report titled The Trend of Samyang Ramen Price Increase Products Release.  Nongshim employees presumably prepared this report after receiving the information from Samyang described above.

85.     On January 6, 2004, Yakult decided to increase prices effective February 1, 2004.  The price increase averaged 7.7% for 19 items.  Yakult also decided to increase the price of its King Ramen to the same amount as Nongshim's Shin Ramyun.

86.     Samyang and Ottogi later delayed the dates of the price increase, and Yakult accordingly adjusted the date of Yakult's price increase from February 1, 2004 to March 1, 2004.

87.     The leader of Yakult's Distribution Management Team, 00 Kim, revealed that Defendants' employees exchanged sales results during this process. For example, Yakult sent Samyang details of Yakult's price increase, including price increase date and period of old price support, by emails dated January 27, 2004, February 5, 2004, and March 9, 2004.

88.     On February 23, 2004, Ottogi decided to increase factory prices effective April 4, 2004.  The factory price increase averaged 6.9% for 47 products. Ottogi also decided to increase the price of its Jin Ramen to the same amount as Nongshim's Shin Ramyun.

**The Fourth Price Increase**

89.     On or around December 20, 2004, Nongshim decided to increase prices effective December 24, 2004.  The price increase averaged 7.1% for 37 products.

90.     On December 22, 2004, Nongshim informed Samyang of the price increase via email.

91.     On February 24, 2005, Samyang decided to increase prices effective March 1, 2005.  The price increase, covering 32 items, averaged 7.2%. Samyang also decided to increase the price of its Ramen to the same amount as Nongshim's Shin Ramyun.  Samyang then provided the details of the price increase to other Defendants.  Samyang then provided the details of the price increase to other Defendants.

92.     On January 7, 2005, Yakult decided to increase prices effective February 15, 2005.  The price increase, covering 24 items, averaged 7.4%. Yakult also decided to increase the price of its King Ramen to the same amount as Nongshim's Shin Ramyun.  Later, because the price increase of Samyang and Ottogi were delayed, Yakult delayed the price increase date from February 15, 2005 to March 15, 2005.

93.     On January 11, 2005, Yakult emailed the details of the price increase to Samyang.

94.     Yakult's Management Team created two documents which discuss competitors' price increases:  (1) a Plan of Ramen Price Increase (Proposal) dated January 5, 2005, and (2) The Request for Adjustment of Noodle Products Price Increase Period dated February 11, 2005.  These documents reported proposed price increases for both Samyang and Ottogi.  The Yakult document noted that the "reason for Price Increase Adjustment" was a market response to competitors' price increase date and price support.

95.     On February 24, 2005, before Ottogi even conclusively decided to increase prices, Ottogi sent Samyang the details of its proposed price increase.

96.     On February 22, 2005, Nongshim created a document titled Meeting for Business Measures that contained the price increase and support plans of Samyang, Ottogi and Yakult.

97.     Sometime before March 10, 2005, 00 Kim at Nongshim created a document titled Ottogi's Price Increase Proposal per Item.  The document seemingly contains non-public information concerning Ottogi's factory price increases, as it includes the exact factory prices of products, which would not be known to the public.  For example, the document reveals that for certain products, only the factory price, and not the retail price, would be increased.  An almost identical document was sent by Ottogi to Samyang on February 25, 2005.

98.     Accordingly, it is likely that Ottogi provided both Nongshim and Samyang with this information.

99.     Several of Defendants' employees have opined as to the difficulty of determining factory prices based on retail prices.  00 Doh of the Department of Sales Planning at Ottogi stated that it is difficult to speculate exactly how much the price is.  We can guess approximately how much percentage of price is different from one another based on market price.  However, we cannot know the exact price.  00 Kim, the Chair of the Head Business Office at Ottogi stated that while rated increase could be speculated roughly, increase rate per item could not be speculated.  00 Suh, the Chair of the Marketing Team at Samyang, stated that it "is not possible to know the exact factory price of a competitors' item by knowing the retail price per item only.  That is why ramen companies have exchanged not only the details of retail price increase, but also the details of factory price (release price) when they share price information of increased products in most cases until now."

**The Fifth Price Increase**

100.   On February 12, 2007, Nongshim decided to increase factory prices effective March 1, 2007.  The factory price increases, covering 39 items, averaged 6.5%.

101.   On February 23, 2007, Nongshim sent a notice of price increase (written for the purpose of sending to stores) to Samyang via fax.  On February 26, 2007, Nongshim sent to Samyang the details of the price increase via email.

102.   On February 28, 2007, the Ottogi Marketing Team wrote The Report of Price Increase of Nongshim Ramen and Snacks.  This report detailed specifics of Nongshim, Samyang, and Yakult's upcoming price increases.

103.   In early and mid-March 2007, Nongshim sent the release date and details of price support to Samyang.  Samyang included this information in an internal document, dated February 26, 2007, titled Details of Nongshim's Price Increase in March 2007 (No. 1).

104.   A March 5, 2007 document written by the Yakult Noodle Marketing Team and titled The Ramen Price Increase in 2007 reports details of the Nongshim price increase, and the progress of Samyang and Ottogi's price increase projects.

105.   On March 7, 2007, Yakult decided to increase factory prices effective April, 2007.  The factory price increases, covering 21 items, averaged 6.6%. Yakult also decided to increase the price of its King Ramen to the same amount as Nongshim's Shin Ramyun.

106.   On March 20, 2007, Yakult emailed details of this price increase to Samyang.

107.   On March 22, 2007, Samyang decided to increase factory prices effective April 16, 2007.  The factory price increases, covering 28 items, averaged 7.3%.  Samyang also decided to increase the price of its Samyang Ramen to the same amount as Nongshim's Shin Ramyun.

108.   On April 11, 2007, Samyang provided details about its price increase to both Nongshim and Ottogi via email.  The email, from 00 Yui of Samyang to 00 Yoon at Nongshim and 00 Chung at Ottogi, stated that the price increase seems to be implemented by the 16th.  However, I should tell you that there is little bit of possibility that the date would be changed.  Please refer to the attached document for the details of price increase.  This document is a final draft, but had not been confirmed.  PM in charge of the price increase said that the increase would be implemented almost as the document said.

22

109.   On April 17, 2007, 00 Yui of Samyang sent 00 Yoon of Nongshim an email detailing production dates of Samyang's price increased products.

110.   On May 4, 2007, 00 Yui of Samyang sent 00 Jung from Ottogi and email about Samyang's old price support period.

111.   On February 28, 2007, Ottogi's Marketing No. 3 Team created The Report of Price Increase of Nongshim Ramen and Snacks.  This report accurately tracked the details of what became Yakult's price increase.  Specifically, the report noted, as to its competitors, that:  although Nongshim "continuously has sent out a rumor of price increase since the end of 2006, sales of that year declined about 1.2%.  Therefore, internally the company had much more dispute about price increase.  However, because of the continued decline of ramen market, it is evident to promote the growth of sales amount and of profit through price increase, rather than through growing the quantity of the sales, and because of its exclusive market share, the company judged that the market dynamics would not change much after the price increase.  Therefore," Nongshim decided to implement the price increase.

112.   The document titled The Examination of Price Increase of Ramen Products Recommended increasing prices at the same level of Nongshim, and detailed the proposals of such a price increase.

113.   On June 26, 2007, Ottogi Marketing Team wrote the Report of Ramen Products Price Increase.  This report noted that information was obtained after checking with the Samyang Marketing Team.  The report recommended raising prices on September 1, 2007, once such information was obtained.

114.   On July 23, 2007, Ottogi decided to increase factory prices effective September 1, 2007.  The factory price increases, totaling 90 items, averaged 4%.

115.   Ottogi also decided to reduce a discount rate by 4%, so the actual average increase totaled 8%.  Ottogi also chose to increase the factory price of its Jin Ramen to 417 1 won, which was still lower than Nongshim's Shim Ramyun

23

price of 430 won, but came out to the same price after taking into account the reduced discount rate.

116.   On July 27 and July 31, 2007, 00 Jung of Ottogi emailed 00 Yui of Samyang details of the Ottogi price increase.

117.   On August 10, 2007, 00 Choi of Nongshim emailed 00 Yui of Samyang, stating that as far as I know, Ottogi has not officially notified so far.  Its price increase rate is the shame as our company's and Samyang's, if we consider the result only.

118.   On August 16, 2007, 00 Kim of Yakult emailed 00 Yui of Samyang the details of Ottogi's price increase.

**The Sixth Price Increase**

119.   From February 20, 2007 to March 3, 2008, Nongshim sent various emails to Samyang detailing their price increases.

120.   In early 2008, Nongshim decided to increase factory prices. The factory price increases, covering 42 items, averaged 11.9%.

121.   On February 18, 2008, 00 Choi of Nongshim sent 00 Yui of Samyang an email stating that Nongshim's price increase is planned to be officially announced this afternoon, so I will inform you again when the price is announced. And this information might be wrong, so please do not have a blind faith in it. And, please pretend of Yakult that you haven't received this provisional price.  00 Choi sent 00 Yui additional updates on February 20th, 22nd, 28th, 29th, and March 3rd.

122.   On February 18, 2008, Samyang decided to increase its prices, effective March 1, 2008.  According to 00 Suh, Chair of Samyang's Marketing Team, Samyang then sent the details of this price increase to Nongshim, Ottogi, and Yakult via wired communication.

123.   On February 28, 2008, Samyang decided to increase factory prices effective March 1, 2008.  The factory price increase, covering 32 items, averaged

11.9%. Samyang also decided to increase the price of its Samyang Ramen to the same amount as Nongshim's Shin Ramyun.

124.   On February 27, 2008, 00 Yui of Samyang emailed the details of its price increase to 00 Choi of Nongshim. On March 3, 2008, 00 Yui of Samyang sent 00 Choi of Nongshim, 00 Kim of Yakult, and 00 Jung of Ottogi an email concerning the details of Samyang's old price support.

125.   On February 26, 2008, Ottogi decided to increase factory prices effective April 1, 2008.  The factory price increase, covering 72 items, averaged 9.4%.

126.   However, Ottogi also decided to reduce a discount rate by 4.1 % so the actual average increase totaled 13.5%.  Ottogi also chose to increase the factory price of its Jin Ramen to 455 won, which was still lower than Nongshim's Shim Ramyun price, but came out to the same price after taking into account the reduced discount rate.

127.   On February 29, 2008, 00 Jung of Ottogi sent 00 Yui of Samyang an email concerning Ottogi's price increases, stating:  as I told you yesterday, whether or not there would be price increase has not been decided yet. However, I am sending you the details of price increase which has been in progress so far, so that you can have it as a reference.  Our company has started production of price increased products of cup ramen, such as Jin Ramen multi packets and spaghetti cup ramen, on February 27.  The email included a chart showing price increases for various Ottogi products.

128.   On March 6, 2008, 00 Jang sent 00 Yui an additional email providing additional details about the dates of the price increases, stating that I am sending you my company's production details for ramen products with new price.  Please refer to it.

129.   On March 10, 2008, Yakult decided to increase factory prices for major products effective April 1, 2008, and various other products effective May 1, 2008.

130.   The factory price increase, totaling 23 items, averaged 12.5%. Yakult also decided to increase the price of its King Ramen the same amount as Nongshim's Shin Ramyun.

**The Ramen Conference**

131.   On March 26, 2008, the General Assembly of Ramen Conference was held at Capital Hotel in Seoul, South  Korea.  At this conference, the Defendants all agreed that they would postpone price increases or lower prices after an increase.

132.   00 Lee, Board Director of Samyang's Head Business Office, stated to the Korean Fair Trade Commission that:  Since the new administration of the South Korean government, inaugurated on February 25, 2008, played an emphasis of price stabilization, it was difficult decision to make a price increase, and because customers' response was also negative about the increase, ramen manufacturing companies worried much about the increase.  Nevertheless, because the price decision had already made based on the exchange of information and date about price increase, each company emphasized (agreed) that any company could not postpone the price increase or that increased price could not be lowered again.

133.   Similarly, 00 Kim, Chair of Samyang Business Management Team, noted to the Korean Fair Trade Commission that due to the change in South Korean government, South Korea was experiencing the feeling of renewal.  As the new administration suggested price stabilization as a major policy as soon as the president's inauguration, companies including Nongshim discussed about ramen price which would be increased.  While worrying about criticism or implications that would cause by price increase, we discussed the prospect of the process and strategic responses about the criticism.

134.    Accordingly, the March 2008 Ramen Conference ensured that the raised prices remained inflated in the future.

**Korean Fair Trade Commission Findings**

135.    On July 12, 2012, the Korean Fair Trade Commission issued the Korea Order, concluding that Defendants, who are the four main producers of Korean Noodles, conspired to fix prices of Korean Noodles.

136.    The Korean Fair Trade Commission imposed monetary and injunctive relief, including $136 billion won (approximately U.S. $120 million) in fines.  It also ordered the Defendants to stop sharing pricing information.

**The Conspiracy Directly Affected Prices of Korean Noodles Sold In the U.S.**

137.    The unlawful price increases of factory prices in South Korea affected not only retail prices in Korea, but affected retail prices in the United States.

138.    During the Class Period, the South Korean Defendants shipped price fixed Korean Noodles directly to their wholly owned and controlled subsidiaries in the United States for resale in this country.

139.    Thus, during the Class Period, Nongshim directly shipped its Korean Noodles to Nongshim America in the United States.  In 2006, for example, sales by in the United States totaled $47.7 million.

140.    Also during the Class period, Ottogi directly shipped its Korean Noodles to Ottogi America in the United States.

141.    During the Class period, Samyang also directly shipped its Korean Noodles to Samyang USA in the United States and Korea Yakult directly shipped its Korean Noodles to Paldo in the United States.

142.    On information and belief, the Defendants tightly oversaw the pricing policies of their United States subsidiaries. Nongshim provides an example.  In 2002, it sought to globalize its Korean Noodles brand in order to capture a greater share of the $540 million United States ramen market.  Its goal was to grow profits by 10% annually.  It sought to do this through strategic initiatives in product

development, sales, and distribution.  In order to achieve these goals, Nongshim instituted on a global basis from its headquarters in South Korea a profitability management information system by product and business and a management infrastructure for sales.

143.     The Defendants engaged in collusive factory-level price increases for their Korean Noodles that were incorporated into their U.S. sales prices of these products.

144.     For example, during the fifth price increase of Korean Noodles in 2006, Ottogi's price increased 12.5% in the United States, while it effectively increased 8% in South Korea.

145.     Similarly Nongshim's price for Korean Noodles increased by 11% in the United States, while it increased 6.5% in South Korea.

146.     Furthermore, during the sixth price increase on Korean Noodles in February to April of 2008, Samyang's prices increased 13.3% in the United States, while they increased 12.6% in South Korea.

147.     Similarly during the same time, Ottogi's prices increased 15% in the United States, while its prices effectively increased 13.5% in South Korea.

148.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been injured in their business and property in that they paid more for Korean Noodles than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Fraudulent and Active Concealment**

149.     Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief.  Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy and violations of law alleged herein until shortly before filing their Complaint.

150.     Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for Korean Noodles.

151.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs and Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for Korean Noodles.

152.     For example, Defendants each issued false and misleading announcements concerning the reasons for their price increases, none of which, disclosed that the Defendants had agreed amongst themselves to fix and raise the price of Korean Noodles.

153.     On May 10, 2001, Nongshim stated that main ingredient cost increases like 10% increase of international wheat price with weakening of Korean won pushes manufacturing costs increase 5-10%.  No mention of an agreement to fix prices with competitors was provided.  A nearly identical misleading statement was made by Nongshim 6 days later and republished by Bloomberg.

154.     On October 23, 2002, Nongshim stated that it will increase the price around 8% due to the price increase of ingredient, wheat flour.  No mention of an agreement to fix prices with competitors was provided.

155.     On October 24, 2002, Nongshim stated that it increases the price due to ingredient price increase like the increases of palm oil, wheat flour and due to management costs increase like freight costs from economic condition changes. No mention of an agreement to fix prices with competitors was provided.

156.     On October 24, 2002, Korea Yakult stated that it is inevitable to increase the price due to the price increases of palm oil, wheat flour and the price increase of freight costs and it is inevitable for the companies to follow to the price increase range of Nongshim since Nongshim is the market leading company.  No mention of an agreement to fix prices with competitors was provided.

157.    On December 18, 2003, Nongshim stated that this year, the prices of importing ingredients like palm oil price, starch and domestic produces like red pepper and green onion are greatly increased and specifically, the increased costs of management fees like freight costs, promotion costs required a price increase on Ramen Instant Noodles.  No mention of an agreement to fix prices with competitors was provided.

158.    On February 24, 2004, Samyang stated that the price is increased due to the price increases of ingredients, palm oil and starch, red pepper, green onion and onion since second half of the last year.  No mention of an agreement to fix prices with competitors was provided.

159.    On December 23, 2004, Nongshim stated that for 8-9% price increase of wheat flour and potato starch and 18% increase of vinyl wrapping due to oil price surge makes inevitable to increase the price.  No mention of an agreement to fix prices with competitors was provided.

160.    On February 28, 2005, Samyang stated that for 9% price increase of wheat flour and 15% increase of packaging costs pressured cost burden and it was inevitable to increase the price.  No mention of an agreement to fix prices with competitors was provided.

161.    On February 27, 2007, Nongshim stated that recently sudden price increases of the wheat flour price of 9% and palm oil increases of 42% are the major factors to increase the price and "Thanks to,wellbeing boom, there was cost increases of new material development to replace chemical seasoning and other environment friendly costs."  No mention of an agreement to fix prices with competitors was provided.

162.    On February 18, 2008, Nongshim stated that recently, the sudden price increases of international ingredients like the price increase of wheat flour of 50% and palm oil increase of 94% and extreme weather changes, imbalance of supply

1    and demand caused an increase in Korean Noodle prices.  No mention of an

2    agreement to fix prices with competitors was provided.

3         163.    On March 14, 2008, Samyang stated that the wheat flour price

4    increased 50%, palm oil price increased 95% and other ingredients prices increased

5    with packaging cost, too in order to justify a Korean Noodle price increase.  No

6    mention of an agreement to fix prices with competitors was provided.

7         164.    As determined by the Korean Fair Trade Commission, the truth is that

8    Korean Noodle price increases substantially exceeded increased input costs.

9         165.    The affirmative acts of the defendants alleged herein, including acts in

10   furtherance of the conspiracy, were wrongfully concealed and carried out in a

11   manner that precluded detection.

12        166.    By its very nature, Defendants' price-fixing conspiracy was inherently

13   self-concealing.

14        167.    The combination and conspiracy alleged herein was fraudulently

15   concealed by Defendants by various means and methods, including, but not limited

16   to secret meetings, surreptitious communications between defendants by the use of

17   the telephone or in-person meetings, the use of non-public emails, and concealing

18   the existence and nature of their competitor pricing discussions from non-

19   conspirators  (including customers and consumers).

20        168.    As a result of Defendants' fraudulent and active concealment of their

21   conspiracy, any and all applicable statutes of limitations otherwise applicable to the

22   allegations herein have been tolled with respect to any claims that Plaintiffs and the

23   Class members may have.

**CLAIMS FOR RELIEF**

**First Claim for Relief**

**(Violations of Sherman Act)**

27        169.   Plaintiffs incorporate and reallege, as though fully set forth herein,

28   each and every allegation set forth in the preceding paragraphs of this Complaint.

31

170.   Plaintiffs allege this claim against all Defendants.

171.   Beginning at least as early as December 2000, Defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating competition in the United States.

172.   In particular, Defendants have agreed, combined and conspired to raise, fix, maintain or stabilize the prices of Korean Noodles sold in the United States.

173.   As a result of Defendants' unlawful conduct, prices for Korean Noodles were raised, fixed, maintained and stabilized in the United States.

174.   The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

175.   For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

A)   participating in meetings and conversations to discuss the prices and supply of Korean Noodles;

B)   communicating in writing and orally to fix prices and manipulate the supply of Korean Noodles, including but not limited to communicating price increases with each other;

C)   agreeing to manipulate prices and supply of Korean Noodles sold throughout the world and in the United States, and to allocate customers of such products, in a manner that deprived indirect purchasers of free and open competition;

D)   pricing Korean Noodles in accordance with the agreements reached; and selling Korean Noodles to customers in the United States at non-competitive prices; and

1    E)    selling Korean Noodles to customers in the United States at

2    non-competitive prices

3    176.   Defendants' conspiracy had the following effects, among others:

4    A)    price competition in the sale of Korean Noodles by Defendants has

5    been restrained, suppressed, and eliminated in the United States;

6    B)    prices for Korean Noodles sold by Defendants has been raised, fixed,

7    maintained, and stabilized at artificially high and noncompetitive levels throughout

8    the United States; and

9    C)    indirect purchasers of Korean Noodles have been deprived of the

10   benefit of free and open competition in connection with the purchase of Korean

11   Noodles.

12   177.   As a direct and proximate result of Defendants' unlawful conduct,

13   Plaintiffs and other members of the Class have been injured and will continue to be

14   injured in their in their business and property by paying more for Korean Noodles

15   purchased indirectly from Defendants than they would have paid in the absence of

16   Defendants' unlawful conduct.

17   178.   Plaintiffs and the Class are entitled to an injunction against Defendants

18   preventing and restraining the violations alleged herein.

19   **Second Claim for Relief**

20   **(Violations of California Cartwright Act)**

21   179.   Plaintiffs incorporate and reallege, as though fully set forth herein,

22   each and every allegation set forth in the preceding paragraphs of this Complaint.

23   180.   Plaintiffs allege this claim against all Defendants.

24   181.   Defendants' contract, combination, trust or conspiracy were

25   substantially centered in, carried out, effectuated and perfected within the State of

26   California, and Defendants' conduct within California injured all members of the

27   Class throughout the United States.

28

33

182.   Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

183.   Beginning at least as early as December 2000, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code.  Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for Korean Noodles at supra-competitive levels.

184.   The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for Korean Noodles.

185.   For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

A)     to fix, raise, maintain and stabilize the price of Korean Noodles;

B)     to allocate markets for Korean Noodles amongst themselves; and

C)     to allocate amongst themselves the production of Korean Noodles.

186.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

A)     price competition in the sale of Korean Noodles has been restrained, suppressed and/or eliminated in the State of California and throughout the United States;

B)     prices for Korean Noodles sold by Defendants  have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California and throughout the United States; and

1    C)    those who purchased from Defendants have been deprived of the

2  benefit of free and open competition.

3    187.    Plaintiffs and the other members of the Class paid supra-competitive,

4  artificially inflated prices for Korean Noodles.

5    188.    As a direct and proximate result of Defendants' unlawful conduct,

6  Plaintiffs and the members of the Class have been injured in their business and

7  property in that they paid more for Korean Noodles than they otherwise would have

8  paid in the absence of Defendants' unlawful conduct.  As a result of Defendants'

9  violation of Section 16720 of the California Business and Professions Code,

10  Plaintiffs seeks treble damages, the costs of suit and reasonable attorneys' fees

11  pursuant to Section 16750(a) of the California Business and Professions Code.

12                              **Third Claim for Relief**

13              **(Violation of the California Unfair Competition Law)**

14    189.   Plaintiffs incorporate and reallege, as though fully set forth herein,

15  each and every allegation set forth in the preceding paragraphs of this Complaint.

16    190.   Plaintiffs allege this claim against all Defendants.

17    191.   Many of Defendants' business acts and practices were centered in,

18  carried out, effectuated and perfected mainly within the State of California, and

19  Defendant's conduct within California injured all members of the Class throughout

20  the United States.  Therefore, this claim for relief under California law is brought

21  on behalf of all members of the Class, whether or not they are California residents.

22    192.   Beginning at least as early as December 2000, Defendants committed

23  and continue to commit acts of unfair competition, as defined by Sections 17200, et

24  seq. of the California Business and Professions Code, by engaging in the acts and

25  practices specified above.

26    193.   This claim is instituted pursuant to Sections 17203 and 17204 of the

27  California Business and Professions Code against Defendants for acts, as alleged

28

herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

194.   The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not limited to, the following:

A)   The violations of Sections 1 and 3 of the Sherman Act, as set forth above;

B)   The violations of Section 16720 et seq., of the California Business and Professions Code, set above; and

C)   Defendants' acts, omissions, misrepresentations, practices and non-disclosures, as described above, whether or not in violation of Section 16720, et seq. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

195.   Defendants' act and practices are unfair to consumers of Korean Noodles in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

196.   Plaintiffs and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business acts or practices.

197.   The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

198.     The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Class to pay supra-competitive and artificially-inflated prices for Korean Noodles.

199.     Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

200.     The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

201.     As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

## Fourth Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

202.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

203.     Plaintiffs allege this claim against all Defendants.

204.     Defendants have been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits.

205.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members.

206.     Plaintiffs seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

**Fifth Claim for Relief**

**(Violations of State Antitrust Laws)**

207.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

208.   Plaintiffs allege this claim against all Defendants.

209.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 et seq.

210.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code §§16700 et seq. and California Bus. & Prof. Code §§ 17200 et seq.

211.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§28-4501 et seq.

212.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 et seq.

213.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

214.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 et seq.

215.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771 et seq.

216.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.51 et seq.

217.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1 et seq.

218.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A et seq.

219.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 et seq.

220.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New York Gen. Bus. Law §§ 340 et seq.

221.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 et seq.

222.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 et seq.

223.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 et seq.

224.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 et seq.

225.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453 et seq.

226.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia §§47-18-1 et seq.

227.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01 et seq.

228.   Class Members in each of the above states paid supra-competitive, artificially inflated prices for Korean Noodles.  As a direct and proximate result of Defendants' unlawful conduct, such members of the Class have been injured in their business and property in that they paid more for Korean Noodles than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### Sixth Claim for Relief

### (Violations of State Consumer Protection and Unfair Competition Laws)

229.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

230.   Plaintiffs allege this claim against all Defendants.

231.   Defendants engaged in unfair competition or unfair, unconscionable,

deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

232. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Bus. & Prof. Code § 17200 et seq.

233. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901 et seq.

234. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 et seq.

235. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480 et seq.

236. Defendants have engaged in unfair competition or unfair or deceptive or unconscionable acts or practices in violation of Kansas Stat. § 50-623 et seq.

237. Defendants have engaged in unfair competition or unfair or deceptive or unconscionable acts or practices in violation of New Mexico Stat. § 57-12-1 et seq.

238. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Gen. Bus. Law § 349 et seq.

239. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1 et seq.

240. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1 et seq.

241. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451 et seq.

242. Class Members in the states listed above paid supra-competitive, artificially inflated prices for Korean Noodles. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business and property in that they paid more for Korean Noodles

than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray, on behalf of themselves and all other members of the Class, for relief as follows:

1.    That the Court determine and certify that the claims alleged herein may be maintained as a class action;

2.    That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

a.    A restraint of trade or commerce in violation of Section 1and 3 of the Sherman Act;

b.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust laws identified herein;

c.    Violations of the state consumer protection and unfair competition laws identified herein; and

d.    Acts of unjust enrichment as set forth herein;

3.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement, unfair competition and unfair, unconscionable, deceptive or fraudulent acts or practices alleged herein in any manner, including:  (a) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (b) communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of Korean Noodles, information concerning prices,

1    customers, markets or other terms or conditions of sale of any such product except

2    to the extent necessary in connection with bona fide sales transactions between the

3    parties to such communications;

4        4.    That Plaintiffs and the Class recover damages to the maximum extent

5    allowed under the applicable laws, and that a joint and several judgment in favor of

6    Plaintiffs and the Class be entered against the Defendants in an amount to be

7    trebled in accordance with such laws;

8        5.    That Plaintiffs and the members of the Class be awarded restitution,

9    including disgorgement of profits obtained by Defendants as a result of their acts of

10   unfair competition and acts of unjust enrichment;

11       6.    That Plaintiffs and the members of the Class be awarded pre- and post-

12   judgment interest, and that that interest be awarded at the highest legal rate;

13       7.    That Plaintiffs and the members of the Class recover their costs of this

14   suit, including reasonable attorneys' fees as provided by law; and

15       8.    That Plaintiffs and the members of the Class receive such other or further

16   relief as may be just and proper.

17                              **DEMAND FOR JURY TRIAL**

18       Plaintiffs demand a jury trial on all issues so triable.

19

20   Dated:  August 14, 2013              Respectfully submitted,

21                                        LAW OFFICES OF GERALD S. OHN, APC
22                                        LAW OFFICE OF YOUNG W. RYU

23

24                                        Gerald S. Ohn, Esq.
25                                        Young W. Ryu, Esq.
                                          Attorneys for Plaintiffs
26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Christina A. Snyder_____ and the assigned Magistrate Judge is _____Patrick J. Walsh_____ .

The case number on all documents filed with the Court should read as follows:

## 2:13-CV-5962-CAS (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____August 14, 2013_____
Date

By  MDAVIS_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| ☐ Western Division | ☐ Southern Division | ☐ Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

CV-18 (08/13)                    NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

Name & Address:
Gerald S. Ohn (SBN 217382)
LAW OFFICES OF GERALD S. OHN, APC
1875 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone: (310) 407-8655

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ANTHONY AN and KENNY KANG, on behalf of themselves and a Class of all others similarly situated,

PLAINTIFF(S)

v.

NONGSHIM COMPANY, LTD.; NONGSHIM AMERICA, INC.; OTTOGI COMPANY, LTD.; OTTOGI AMERICA, INC.; SAMYANG FOODS COMPANY, LTD.; SAM YANG (U.S.A.), INC.; KOREA YAKULT CO., LTD; PALDO CO., LTD.; and DOES 1-10,       DEFENDANT(S).

CASE NUMBER

CV13-05962 -CAS/(PJWx)

**SUMMONS**

TO:   DEFENDANT(S):  The above-named Defendants.

☐ ORIGINAL

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Gerald S. Ohn_____, whose address is _1875 Century Park East, Suite 700, Los Angeles, CA 90067_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __AUG 1 4 2013__

By: _____
        Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                **SUMMONS**

Name & Address:
Gerald S. Ohn (SBN 217382)
LAW OFFICES OF GERALD S. OHN, APC
1875 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone: (310) 407-8655

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ANTHONY AN and KENNY KANG, on behalf of
themselves and a Class of all others similarly situated,

PLAINTIFF(S)

v.

NONGSHIM COMPANY, LTD.; NONGSHIM AMERICA,
INC.; OTTOGI COMPANY, LTD.; OTTOGI AMERICA,
INC.; SAMYANG FOODS COMPANY, LTD.; SAM
YANG (U.S.A.), INC.; KOREA YAKULT CO., LTD;
PALDO CO., LTD.; and DOES 1-10,          DEFENDANT(S).

CASE NUMBER

**CV13-05962** -(AS/PSW)

**SUMMONS**

TO:     DEFENDANT(S):  The above-named Defendants.

COPY

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, _Gerald S. Ohn_____, whose address is
_1875 Century Park East, Suite 700, Los Angeles, CA 90067_____.  If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint. You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated:  AUG 1 4 2013

By: _____

MARILYN DAVIS

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

ANTHONY AN and KENNY KANG, on behalf of themselves and a Class of all others similarly situated

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

NONGSHIM COMPANY, LTD.; NONGSHIM AMERICA, INC.; OTTOGI COMPANY, LTD.; OTTOGI AMERICA, INC.; SAMYANG FOODS COMPANY, LTD.; SAM YANG (U.S.A.), INC.; KOREA YAKULT CO., LTD; PALDO CO., LTD.; and DOES 1-10

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Gerald S. Ohn (SBN 217382), LAW OFFICES OF GERALD S. OHN, APC, 1875 Century Park East, Suite 700, Los Angeles, CA 90067, Tel.: (310) 407-8655.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☒ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. Sections 1, 3.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☒ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | **TORTS** | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **PERSONAL PROPERTY** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | ☐ 370 Other Fraud | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 371 Truth in Lending | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 380 Other Personal Property Damage | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 385 Property Damage Product Liability | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | **BANKRUPTCY** | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 422 Appeal 28 USC 158 | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | **CIVIL RIGHTS** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 440 Other Civil Rights | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 441 Voting | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accomodations | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | | ☐ 446 American with Disabilities-Other | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 448 Education | ☐ 790 Other Labor Litigation | |
| | | | | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: CV13-05962-CAS (PJWx)

**AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO  ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ NO  ☒ YES

If yes, list case number(s): CV 13-05274 PA (RZx)

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| NONGSHIM AMERICA, INC.; OTTOGI AMERICA, INC.; SAM YANG (U.S.A.); KOREA YAKULT CO.; PALDO CO., LTD. - Los Angeles. | NONGSHIM COMPANY, LTD.; OTTOGI COMPANY, LTD.; SAMYANG FOODS COMPANY, LTD. - South Korea. |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note:** In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _Jerusim_  DATE: August 13, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |